**PERLBERGER LAW ASSOCIATES, P.C.**
**BY: Norman Perlberger, Esquire (np 7565)**
**One Presidential Blvd., #315**
**Bala Cynwyd, PA 19004**
**(610) 664-2440**
**e-mail: perlberglaw@aol.com**

### IN UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHELLE J. GILLUM** | : | **CIVIL ACTION** |
| **1010 N. Ridge Road #418** | : | |
| **Wichita, KS 67212** | : | |
| | : | |
| **vs.** | : | **NO.** |
| | : | |
| | : | |
| **NATIONAL MEDICAL SERVICES, INC.** | : | |
| **d/b/a NMS LABS** | : | |
| **3701 Welsh Road** | : | **JURY TRIAL DEMANDED** |
| **Willow Grove, PA 19090** | : | |
| **and** | : | |
| **COMPASS VISION, INC.** | : | |
| **SW Town Center Loop E** | : | |
| **Wilsonville, OR 97070** | : | |

## COMPLAINT

### Nature of Claim

1.      This is an action in negligence against the named testing lab Defendant National

Medical Services, Inc. ("NMS") related to its promoting, advertising, marketing, selling,

reporting, interpreting and setting arbitrary cutoffs for ethylglucuronide ("EtG") drug testing to

test for professional alcohol abuse.  It is also an action in negligence against the named Third

Party Administrator (TPA) Defendant Compass related to its promoting, advertising, marketing,

selling and contracting with professional licensing boards for EtG testing, and designing,

implementing, and managing professional drug and alcohol testing programs using the EtG test, and reporting and interpreting the EtG test at the arbitrarily set cutoffs as sole proof of professional alcohol abuse. The negligent actions of the Defendants negatively affected the ability of Plaintiff, Michelle J. Gillum, to practice as a physical therapist in the State of Kansas where she is licensed.

<u>**Parties**</u>

2.      Plaintiff, MICHELLE J. GILLUM, is a resident and citizen of the State of Kansas, residing at 1010 N. Ridge Road #418, Wichita, KS 67212.  Ms. Gillum is a physical therapist who is and has been, for all times relevant hereto, licensed to practice in the State of Kansas.

3.      Defendant NATIONAL MEDICAL SERVICES, INC. d/b/a NMS LABS ("NMS") is a corporation with its principal place of business in Pennsylvania at 3701 Welsh Road, Willow Grove, PA 19090. NMS also has lab testing facilities and offices throughout the United States and is doing business in this District.

4.      NMS engages in alcohol and drug screening programs throughout the United States, and as testing labs set the cutoffs and analyze, report and interpret the results of EtG tests upon health care professionals licensed to practice in their individual states.

5.      NMS marketed and sold its EtG systems, testing facilities and reporting services to employers, state and municipal agencies and state licensure boards for testing employees or licensees.

6.      Defendant COMPASS VISION, INC. ("Compass"), is a corporation with its principal place of business in Oregon at SW Town Center Loop E, Wilsonville, OR 97070.

7.      Compass contracts with licensing boards as a third party administrator ("TPA"), collecting urine samples for EtG analysis by testing labs, providing the services of medical review officers ("MRO") in alcohol and drug screening programs throughout the United States, reporting to said licensing boards and interpreting the results of EtG tests upon health care professionals licensed to practice in their individual states.

8.      Compass contracted their screening and testing services to various state and municipal agencies, state licensure boards and other employers throughout the United States, including the State of Kansas where Plaintiff resides and practices as a physical therapist.

9.      Compass also provides a Medical Review Officer ("MRO") Dr. Martha Brown for alleged independent and unbiased review and opinions to the employers, agencies and boards contracting for its services for interpreting whether the positive EtG results for a given licensed professional should be utilized for disciplinary purposes.

### Jurisdiction and Venue

10.     Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. Section 1332 (a), and that damages exceed, exclusive of interest and costs, the sum of Seventy-five Thousand ($75,000.00) Dollars.

11.     Venue lies in the Eastern District of Pennsylvania as one of the lead Defendants has its principal place of business located therein, and the other Defendants are doing business in this District.

### Background

12.     At all times relevant hereto, it is believed and therefore averred that the Defendants provided to the Board the results and interpretation of the results of EtG alcohol testing upon Plaintiff.

13.     Because of the sensitive nature of their positions with respect to patient care, licensed professionals, who have an admitted history of addiction, are allowed to enter into diversion programs and/or probationary programs by which they agree to submit to random urine analysis to document a drug-free condition in a known "zero-tolerance" environment.

14.     Random drug screening is not a requirement for licensed professionals unless they have an admitted history of addiction, and have voluntarily entered into an agreement as part of continued employment.

15.     "EtG" stands for ethyl glucuronide, a metabolite of alcohol, and was reported by Gregory Skipper, M.D. ("Dr. Skipper") and Friedrich Wurst, M.D., in November 2002 at an international meeting of the American Medical Society, to provide proof of alcohol consumption as much as 5 days after drinking an alcoholic beverage, well after the alcohol itself had been eliminated from the body.

16.     In 2003, because of these and other reportedly remarkable results (e.g., positive findings, confirmed by admissions by the tested individuals, after traditional urine tests had registered negative), EtG testing began in the United States.

17.     On information and belief, the Defendants became leading proponents of EtG testing, and, starting in 2003, published statements and claims promoting the absolute reliability and validity of EtG in detecting alcohol abuse, in promotional materials, on websites, in published articles and in statements by their sales personnel. For example:

a.     Concerning testing lab Defendant NMS:

(1)     It is believed and therefore averred that NMS on its laboratory reports indicating the results of EtG testing, issued at relevant times to this action, included the statement that "any value above 250 ng/mL indicates ethanol consumption."

4

(2)    NMS at times on its laboratory reports also included information, following the statement above, concerning results for consumption of 20 to 33 fl. oz. of beer and stated that "This test was developed and validated by NMS."

b.    Concerning TPA Defendant Compass: It is believed and therefore averred that Compass Vision claims that any EtG test result of 500 ng/mL and above conclusively proved intentional consumption of an alcoholic beverage, and that Compass sponsored a paper with that claim by Dr. Martha Brown, its employee and Medical Review Officer.

18.    It is believed and therefore averred that based on such unequivocally conclusive statements and claims by the Defendants, states instituted EtG testing and the state professional licensing boards became signatories to service contracts with Compass, which in turn engaged the Defendant NMS as a testing lab facility for EtG testing programs,

19.    On information and belief, the testing lab Defendants determined and established differing "reporting limits" or "cutoffs" of 100, 250 and 500 ng/mL respectively, at or over which, EtG test results would be reported as "positive" and interpreted by the labs as proof the tested person was drinking alcoholic beverages.

20.    It has come to light about EtG testing that:

a.    Many ordinary products, including the omnipresent Purell sanitizer and other hand sanitizers used in hospitals throughout the country, contain ethanol;

b.    The use or exposure to such products – known collectively as "incidental" or "involuntary" – could result in positive test results, since they all would metabolize as ethyl glucuronide;

c.    Cutoffs of 100 ng/mL, 250ng/mL and 500ng/mL are arbitrary standards since incidental exposure to ethanol-containing products could show up at levels well above these levels;

d.    The published state of scientific knowledge, going as far back as March 2004, included the information set forth in subparagraphs a-c above.

21.    This has not deterred the $4 billion-a-year industry, and the Defendants, it is believed and therefore averred, solely due to a motive of profits,  (a) continue to promote the EtG

test as valid, (b) have not established a non arbitrary cutoff; and/or, (c) have not repudiated the test to the licensing boards and agencies.

22.     On August 12, 2006, The Wall Street Journal published a front-page article, titled "A Test for Alcohol – And Its Flaws."

23.     Quoting Dr. Skipper, among others, the article includes:

> "Little advertised, though, is that EtG can detect alcohol even in people who didn't drink. Any trace of alcohol may register, even that ingested or inhaled through food, medicine, personal-care products or hand sanitizer."

> "The test 'can't distinguish between beer and Purell' hand sanitizer, says H. Westley Clark, director of the Federal Substance Abuse and Mental Health Services Administration. . . 'When you're looking at loss of job, loss of child, loss of privileges, you want to make sure the test is right', he says…"

> "Use of this screen has gotten ahead of the science,' says Gregory Skipper…"

24.     In a February 2007 article in the magazine "New Scientist," Dr. Skipper is quoted that:

> "…there is not yet an agreed threshold concentration that can be used to separate people who have been drinking from those exposed to alcohol from other sources. Below 1000 nanograms. of EtG per millilitre of urine is probably 'innocent', and above 5000 booze is almost certainly to blame. In between there is a question zone…"

25.     Upon information and belief, the Defendants continue to recklessly deny and challenge these warnings, insisting that the EtG tests are accurate and reliable measurements for the proof of alcohol abuse based on alleged scientific research.

26.     On September 28, 2006, SAMHSA, a federal agency that is part of the U.S. Department of Health and Human Resources, issued an Advisory, which on the first page contained a "grey box" warning, as follows:

"Currently, the use of an EtG test in determining abstinence lacks sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a criminal justice or a regulatory compliance context, has truly been drinking. Legal or disciplinary action based solely on a positive EtG, or other test discussed in this *Advisory* is inappropriate and scientifically unsupportable at this time. These tests should currently be considered as potential valuable clinical tools, but their use in forensic settings is premature."

27.    The Defendants have refused to follow the SAMHSA Advisory and continue to utilize arbitrary cutoffs, and support their "positive" findings to the Board (and other licensing and law enforcement agencies) in the face of disciplinary action against the tested individuals.

28.    NMS, by promoting, advertising, marketing, selling, reporting, interpreting and setting arbitrary cutoffs for ethylglucuronide ("EtG") drug testing to test for professional alcohol abuse and to allegedly establish that the Plaintiff consumed an alcoholic beverage in violation of her abstinence agreement, had a duty to use a reasonable degree of care to use a reliable test and to avoid erroneously interpreted test results.

29.    Compass by promoting, advertising, marketing, selling and contracting with professional licensing boards for EtG testing, and designing, implementing, and managing professional drug and alcohol testing programs using the EtG test and reporting and interpreting the EtG test at the arbitrarily set cutoffs as sole proof of professional alcohol abuse and to allegedly establish that the Plaintiff consumed an alcoholic beverage, had a duty to use a reasonable degree of care to use a reliable test and to avoid erroneously interpreted test results.

### Operative Facts

30.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1- 29 above, as if fully set forth herein.

31.    In or about November, 2004, after having admitted to prescription pain medication dependency and as a result of having admitted to drinking two glasses of wine to try

7

to cope with the anniversary of a grandchild's death, Michelle J. Gillum entered into a three year extension to her recovery program agreement with the Kansas State Board of Physical Therapists that included random urine testing.

32.     At all relevant times to this action after November 2004, including the time in which she participated in the program while working as a physical therapist, Ms. Gillum maintained her sobriety, denied intentionally drinking any alcoholic beverages and did not drink any alcoholic beverage.

33.     At all relevant times after November, 2004, Ms. Gillum completely complied with all of the aspects of her program, including attending meetings, and did her job soberly and competently.

34.     Despite working hard to maintain her recovery and regain her professional reputation, on or about July 5, 2006, Ms. Gillum submitted to a random urine analysis collected by Compass and performed by NMS.

35.      Ms. Gillum received notice of a "positive" result on the EtG test, as reported and interpreted by Defendants Compass and NMS, despite the fact that she had not drank an alcoholic beverage, and suffered injury when she was found in violation of her agreement, was not allowed to work for a period of time and her program was extended until December 2009.

36.     Ms. Gillum continued to declare and maintain that she had not drank alcoholic beverages, but she was labeled a liar, and not believed, due to the actions of both Defendants, including Compass through its MRO, in maintaining that these EtG tests were proof that she had drank alcoholic beverages.

37.     After the false positive, Ms. Gillum has continued to submit to testing and has suffered severe apprehension and anxiety from the fear of again having a false positive EtG test

and from the possibility of suffering a permanent stain on her license should she not be allowed to finish her program.

38.     The so called "positive" EtG testing of Ms. Gillum and the injuries she suffered are as a direct result of the negligence and/or recklessness of the Defendant NMS in promoting, advertising, marketing and/or selling the EtG test, setting arbitrary cutoffs for EtG testing and reporting the EtG test at the arbitrary cutoffs and/or invalidly utilizing and interpreting the EtG test to allegedly establish that Ms. Gillum consumed an alcoholic beverage, when the test lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

39.     The so called "positive" EtG testing of Ms. Gillum and the injuries she suffered are also as a direct result of the negligence and/or recklessness of the Defendant Compass in promoting, advertising, marketing  and/or selling the EtG test and/or contracting with professional licensing boards for EtG testing and/or designing, implementing and managing professional drug and alcohol testing programs using the EtG test and/or reporting, interpreting and/or utilizing the EtG test, through its MRO, at arbitrarily set cutoffs as sole proof of professional alcohol abuse to allegedly establish that Ms. Gillum consumed an alcoholic beverage, when the test lacked sufficient proven specificity for use as primary or sole evidence that an individual prohibited from drinking, in a regulatory compliance context, had truly been drinking.

40.     As a result of the "positive" EtG tests, Ms. Gillum was suspended for a period of time, not allowed to work as a physical therapist, and suffered damage to her reputation with consequent humiliation, anxiety and stress.

41.     As a further result of the "positive" EtG tests, Ms. Gillum's program was extended for three years with additional costs for testing and treatment and she required legal counsel for a hearing.

42.     As a further result of the "positive" EtG tests, Ms. Gillum suffered damage to her reputation and credibility in her chosen profession.

43.     It is believed and therefore averred that as a result of the evidence that the EtG test was unreliable in proving that those tested had drank alcoholic beverages, in or about March 2007, the Kansas State Board of Physical Therapists stopped using EtG testing and extinguished continuing penalties and discipline to physical therapists in Kansas, including Ms. Gillum, who had been punished as a result of so called "positive EtG tests.

44.     Prior to the aforesaid action of the Kansas State Board of Nursing, the threat of a permanent stain on Ms. Gillum's license, the possible revocation of her physical therapy license after years of education and commitment to her profession, her damaged reputation and credibility and the apprehension that she would again have false positive tests have caused Plaintiff to suffer severe emotional distress, despite her knowing that she did not drink alcoholic beverages and that this test must have been a false positive.

45.     As a direct and proximate result of the Defendants' negligence, Michelle J. Gillum suffered monetary damages as a result of lost earnings and consequent costs for medical evaluations, treatment, program attendance, drug screenings and legal fees.

46.     The aforesaid negligence and recklessness on the part of the Defendants, in disregarding the evidence of the unreliability of EtG testing for the purpose that they marketed and utilized it, was wanton and/or outrageous in nature.

## COUNT I
### Negligence

47.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-46 above, as if fully set forth herein.

48.     Plaintiff was the intended test subject and the Defendants knew or had reason to know that her license and occupation would be in jeopardy if she tested positive.

49.     Because of the serious and devastating consequences of reporting that the results were positive (within cutoffs established by NMS and used for interpretation by Compass), the Defendants had to exercise their duty of care to the foreseeable test subjects reasonably and appropriately.

50.     Instead, upon information and belief, Defendant NMS acted negligently and/or recklessly by:

a.      Marketing its tests without conducting adequate scientific or medical studies;

b.      Establishing cutoffs, over which test results would be reported as "positive" and interpreted to mean that the tested individual had drank alcoholic beverages in violation of recovery agreements and probation, that were arbitrary and scientifically unreliable and invalid;

c.      Promoting the EtG test with unsupported and false statements that a positive EtG test would unequivocally establish that the subject individual had consumed alcoholic beverages;

d.      Publishing warnings that the failure to conduct such a test would be negligence on the part of an employer or licensing board;

e.      Falsely asserting that the EtG test was the best way of ferreting out former alcoholics or drug users who were resuming or beginning to engage in prohibited alcoholic consumption in occupations requiring a "zero tolerance";

f.      Falsely asserting that EtG is not detectable in the urine unless an alcoholic beverage has been consumed, thereby concealing that incidental or involuntary exposure or consumption of products containing alcohol could result in positive findings;

g.  Failing and refusing to re-evaluate and re-set cutoff limits at levels that were scientifically sound and reliable markers for detecting the prohibited activity of alcoholic beverage consumption, and excluding other causes for their results;

h.  Failing to heed and, instead, denying publicly the warnings or cautionary advisories issued by Dr. Skipper, SAHMSA and others – that the cutoff levels were unreliable and arbitrary, and that incidental use could trigger positive results at levels at or above the cutoffs;

i.  Failing to protect those tested from foreseeable substantial harm in the form of disciplinary and punitive measures, when Defendants' EtG test systems were employed and relied upon for their accuracy and reliability.

j.  Utilizing, reporting and interpreting their EtG results to assert that Plaintiff was violating her recovery by intentionally drinking alcoholic beverages.

51.  Further, upon information and belief, the Defendant Compass acted negligently

and/or recklessly by:

a.  Marketing its EtG services without conducting adequate scientific or medical studies;

b.  Promoting the EtG test with unsupported and false statements that a positive EtG test would unequivocally establish that the subject individual had consumed alcoholic beverages;

c.  Publishing warnings that the failure to conduct such a test would be negligence on the part of an employer or licensing board;

d.  Falsely asserting that the EtG test was the best way of ferreting out former alcoholics or drug users who were resuming or beginning to engage in prohibited alcoholic consumption in occupations requiring a "zero tolerance";

e.  Falsely asserting that EtG is not detectable in the urine unless an alcoholic beverage has been consumed, thereby concealing that incidental or involuntary exposure or consumption of products containing alcohol could result in positive findings;

f.  Reporting and interpreting positive EtG tests based on cutoff levels that were scientifically unsound and unreliable markers for detecting the prohibited activity of alcoholic beverage consumption and excluding other causes for their results;

g.  Failing to heed and, instead, denying publicly the warnings or cautionary advisories issued by Dr. Skipper, SAHMSA and others – that the cutoff levels

were unreliable and arbitrary, and that incidental use could trigger positive results at levels at or above the cutoffs;

h.    Failing to protect Plaintiff from foreseeable substantial harm in the form of disciplinary and punitive measures, when Defendants' EtG test systems were employed and relied upon for their accuracy and reliability.

i.    Bootstrapping alleged positive evidence of alcohol consumption with incompetent, inadequate and cursory reviews by MROs employed by Compass, whose duty to the Plaintiff was to protect her from false accusations and provide licensing boards and employers with: 1) either a conclusion that cautioned against disciplinary or other punitive action in the face of a "positive" EtG test, or 2) concluding that other factors or causes were identified to account for the positive results; and,

j.    Utilizing, reporting and interpreting the EtG results to assert that Plaintiff was violating her recovery by intentionally drinking alcoholic beverages.

52.    It was foreseeable to the Defendants that false positive and/or invalidly interpreted EtG results would severely damage the reputation and credibility of physicians, pharmacists, nurses and physical therapists who were maintaining their recovery from addiction, and that the apprehension of further false positives and/or invalidly interpreted EtG results and the damage to their reputation would cause severe anxiety and emotional distress to such professionals, who had spent years in education to gain the right to practice their chosen profession, and who had in actuality maintained their recovery by overcoming addictions in order to reestablish their reputations as competent professionals.

53.    As a direct and proximate result of Defendants' actionable conduct, Plaintiff suffered suspension, cessation of occupation, loss of earnings and earning capacity, substantial counsel fees in defending herself before the licensing board, substantial and draining expenses associated with random EtG tests and other evaluations and other pecuniary losses flowing directly and consequentially from her positive test results and required costs associated with

ongoing EtG testing, in addition to non-economic losses including humiliation, damage to reputation and severe emotional and psychological distress.

54.     The actions of the Defendants, in recklessly disregarding the evidence from SAMHSA and Dr. Skipper as to the unreliability of EtG testing as primary or sole proof that a licensed professional prohibited from drinking in a regulatory compliance context, has truly been drinking and in subjecting Plaintiff to discipline and license suspension as a result of their invalid interpretation of EtG testing using arbitrary cutoffs was outrageous in nature and, therefore, entitles Plaintiff to both compensatory and punitive damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against the Defendants as follows:

1.     Awarding compensatory damages for economic losses in the form of lost earnings and diminution of earning capacity;

2.     Awarding compensatory damages for any non-economic damages suffered by Plaintiff;

3.     Awarding Plaintiff punitive damages in an amount to be determined at trial;

4.     Awarding Plaintiff her reasonable attorney's fees;

5.     Awarding Plaintiff pre-judgment and post-judgment interest as provided by law;

6.     Awarding Plaintiff her costs of suit herein incurred; and

7.     Awarding Plaintiff such other and further relief as may be just and proper.

PERLBERGER LAW ASSOCIATES, P.C.


BY:      */s/ Norman Perlberger*
         NORMAN PERLBERGER, Esquire (np7565)
         Attorney for Plaintiff